IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-40965

---

LARRY RIEL

Plaintiff-Appellant,

versus

ELECTRONIC DATA SYSTEMS CORPORATION

Defendant-Appellee.

---

Appeal from the United States District Court
For the Eastern District of Texas

---
November 1, 1996
(                    )

Before HIGGINBOTHAM, DUHÉ, and BENAVIDES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is a suit under the Americans with Disabilities Act, 42 U.S.C. §§ 12102-213 (West 1994). The district court granted summary judgment to the employer, and the employee appeals. We review *de novo*. Finding questions of material fact, we reverse and remand.

I.

We take plaintiff's summary judgment evidence as true and draw all reasonable inferences in his favor. *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993).

Electronic Data Systems Corp. develops, markets, and maintains computer-based systems for other companies. Typically, an EDS

contract with a customer defines the customer's requirements and the test and delivery dates for the computer system. Having defined the customer's needs and timetable, EDS breaks the development and design of the system into small, discrete segments. EDS assigns each segment to an individual or group of its employees. Progressive segments of a project are generally built on the prior segments. As a part of this process, EDS sets completion dates for each segment, as well as intermediate (or "milestone") dates. The completion dates for the segments are coordinated to insure that EDS meets the date for final delivery to the customer.

Plaintiff Larry Riel worked for eight years in various positions at EDS. Most recently, Riel worked as a systems engineer. Riel has been a diabetic for decades. As a result, he experiences vision and renal-system health problems. Riel alleges that his diabetes and renal problems also cause severe fatigue, periodically interfering with his job performance.

As a systems engineer, Riel worked on various segments of EDS's projects. In 1992, EDS assigned Riel to a computer project under a new supervisor. Later in the same year, Riel began suffering from fatigue. At that time, Riel did not know the fatigue's cause. Riel began to miss certain "milestone deadlines" in his particular project. His new supervisor attributed this failure to Riel's tendency to socialize during work hours. Riel attributes these failures to the fatigue caused by his renal condition and diabetes. Whatever the cause, the parties agree that

Riel never failed to meet the final deadline on any project; he missed only the milestone deadlines. Riel claims that EDS adjusted milestone deadlines for other employees when it was apparent that a particular assignment was more burdensome than had been previously thought, or when the employee in question needed special accommodation.

In late 1992 and early 1993, EDS supervisors began trying to remedy Riel's inability to meet the milestone deadlines. After two formal counseling sessions and a "below average" performance rating, the supervisors resolved to place Riel on a "Personal Improvement Plan." The PIP included a series of several new milestone deadlines. When they implemented Riel's PIP, the supervisors informed Riel that failure to meet any one of the new milestones could constitute grounds for discharge. However, Riel claims that in previous cases failure to meet milestone deadlines by other employees on PIPs did not result in discharge.

Apparently consulting with an internal officer familiar with the ADA, Riel's supervisors also gave him a written list of what EDS considered the essential functions of a systems engineer. The list included the following: coding and testing programs, responding to customer communications, interacting with other staff, and working flexible hours. Meeting milestone deadlines was not on the list. According to Riel, the record shows that he performed all of the listed functions completely.

During the same month that EDS placed Riel on the PIP, Riel had an emergency appendectomy. During surgery, doctors discovered

3

that Riel's diabetes had blossomed into renal failure. Riel and his physician suggest that this renal failure caused his fatigue. When EDS learned of Riel's health problems, EDS asked Riel to see EDS's doctor. Riel twice complied. In the midst of these physician visits, Riel's direct supervisor spoke to Riel's physician, and listed for the doctor the essential functions of a systems engineer; again, the list did not include meeting milestone deadlines.

Eventually, Riel missed a total of thirteen PIP milestone deadlines. Riel requested a transfer, but EDS refused and cited its policy against transferring employees on PIPs or with "below average" ratings. Then EDS fired Riel. The parties agree that EDS fired Riel for failing to meet the milestone deadlines. The parties dispute the extent of Riel's progress at the time he was fired. Accepting, as we must, Riel's version of the record, Riel was within two or three days of completing all of his assigned tasks, and would have been able to complete all of them by EDS's scheduled final deadlines.

Following his termination, Riel sued, alleging that EDS violated the ADA by failing to accommodate his renal failure and accompanying fatigue. The district court applied the *McDonnell Douglas* framework to analyze Riel's contention of discrimination. It found that Riel was not a "qualified individual with a disability" because he could not perform the essential function of meeting milestone deadlines, with or without accommodation, and granted summary judgment. In the alternative, the district court

4

also found that the accommodations sought by Riel were not "reasonable accommodations" within the meaning of the act, which also justified summary judgment for EDS.  Riel now appeals.

## II.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . ."  42 U.S.C. § 12112(a).  The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* at § 12112(b)(5)(A).  The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* at § 12111(8).  "Reasonable accommodation" may include "job restructuring, part-time or modified work schedules . . . ."  Id. at § 12111(9)(B).  The "undue hardship" analysis requires courts to consider factors including "the nature and cost of the accommodation;" the size of the facility and the business entity involved in terms of financial resources, personnel, and geography; and the type of operations including composition, structure, and function.  *Id.* at (10)(B).

5

The ADA mandate that employers must accommodate sets it apart from most other anti-discrimination legislation. Race discrimination statutes mandate equality of treatment, in most cases prohibiting consideration of race in any employment decision. In contrast, an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA. By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities.

The terms "reasonable accommodation" and "undue hardship" often go hand-in-hand. Although the terms are separately defined, *see* § 12111(9)-(10), the ADA provides that employers are liable for failing to make reasonable accommodations to qualified individuals unless the employer demonstrates that the accommodation imposes undue hardship. § 12112(b)(5)(A). Furthermore, employers with a "business necessity" have a defense when they impose "qualification standards, tests, or selection criteria that . . . tend to screen out" individuals with disabilities. § 12113(a).

Ultimately, the employer bears the burden of proof for both "undue burden" and "business necessity" because both are affirmative defenses under the language of the statute. Section 12112(b)(5)(A) states that "unless [the employer] can demonstrate" an undue burden, it may not discriminate. Similarly, section 12113(a) (titled "Defenses") begins with the phrase "[i]t may be a defense." In contrast, discrimination is defined to be a "failure to implement reasonable accommodations," suggesting that the

6

plaintiff bears the burden of proof on that issue. This places the burdens where they comfortably fit--both within the statutory scheme and the practical administration of pre-trial and trial proceedings. The employee must show that the employer failed to implement a reasonable accommodation, and the employer may defend by showing business necessity or undue burden.

## A.

Riel's condition is a disability if he has "a physical or mental impairment that substantially limits one or more of [his] major life activities." § 12102(2). The ADA does not define "major life activities." But EEOC regulations promulgated under the ADA define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). Riel must show that he has a physical impairment and that it substantially limits major life activities. Because Riel points to fatigue related to his renal condition as causing his substantial limitations, his evidence must show that his physical condition of renal failure caused his fatigue. An employer does not violate the ADA when it fires an employee for inability to perform any job function, however trivial, when that inability has nothing to do with the employee's disability.

The record contains ample evidence to support a finding of fact that Riel's renal condition caused fatigue. Riel offered medical testimony supporting his motion for summary judgment that

7

one symptom of his renal condition was fatigue. Riel also offered affidavits tending to show that the fatigue caused his inability to meet the milestone deadlines. As the parties agree that EDS fired Riel for missing the milestone deadlines, Riel has offered sufficient evidence to avoid summary judgment on this element.

B.

Riel must also demonstrate that he is a "qualified individual with a disability." *See* §§ 12111(8), 12112(b)(5)(A). He must demonstrate that "with or without reasonable accommodation, [he] can perform the essential functions of the employment position." *Id.* at § 12111(8). The parties agree that Riel did not meet the milestone deadlines. On the other hand, Riel's evidence, viewed in the light most favorable to him, shows that he can meet final deadlines. The question is thus whether meeting milestone deadlines alone, without regard to final deadlines, is an essential function of the systems engineer position.

Congress did not specify which job functions are "essential" under the ADA. It provided that whenever an employer gives written descriptions of the essential functions of a job, that description is entitled to substantial deference. 42 U.S.C. § 12111(8). However, none of EDS's written descriptions mention milestone deadlines. The EEOC regulations accompanying the ADA define "essential functions" as "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n). Though the term does not include "marginal functions," those functions that are

8

essential are not limited to those that are not marginal. *See id.* A number of types of evidence are relevant to whether a function is "essential," including:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; . . .
> (iv) The consequences of not requiring the incumbent to perform the function; . . .
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3). Riel introduced evidence suggesting that only final deadlines are important to whether a systems engineer can function within the EDS structure. Riel also introduced evidence that EDS often adjusted milestone deadlines according to the ongoing needs of other employees. And, as noted, neither the written description of the essential functions of a systems engineer given to Riel nor the oral description given to Riel's physician included meeting milestone deadlines. EDS now takes the position that milestone deadlines are essential. Given the dispute as to this material fact, Riel is entitled to present his evidence to a jury.

We do not here hold that the absence of milestone deadlines from either list is conclusive. On the contrary, neither list included other obviously essential functions, such as regular job attendance. Meeting all deadlines might fall into this category of obviously essential tasks, absent other evidence. But Riel's non-list evidence is sufficient under the plain language of the statute

9

to raise an issue of fact as to whether meeting milestone deadlines is essential to the position of a systems engineer.

C.

Given that Riel's summary judgment evidence presents questions of fact on the first two issues, we still must address whether Riel has proposed a "reasonable accommodation" to his disability. Reasonable accommodation is an element of a *prima facie* case of discrimination under the ADA, § 12111(8), and Riel thus bears the burden of proof of reasonableness. However, a reasonable accommodation is "*a method of accommodation* that is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations." *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993), *cert. denied*, 114 S.Ct. 1538 (1994) (interpreting "reasonable accommodation" under the Rehabilitation Act) (emphasis original).

Riel proposed two alternative accommodations to EDS: further adjustment of the milestone deadlines and transfer to another position within EDS that does not have milestone deadlines. Riel's summary judgment evidence tends to establish that he was capable of meeting final deadlines and that he had always met them in the past. In support of his proposed accommodations, Riel offered evidence in the summary judgment proceedings illustrating that EDS often transferred employees and that he himself had been transferred repeatedly. At least one job that Riel had previously

10

performed, teaching new systems engineers, had no deadlines at all. Finally, Riel's evidence suggests that EDS often relaxed milestone deadlines for other employees who ran into unexpected difficulty meeting them and that this caused no disruption to EDS so long as the systems engineers finished project segments by the final deadlines. These facts, put forward by Riel, meet his burden to propose "reasonable accommodations."

EDS argues it may prevail on summary judgment by demonstrating that Riel's proposed accommodations were unreasonable. EDS contends that a relaxation of milestone deadlines would cause disruption in its working structure, but this is for the trier of fact. EDS also argues that it could not transfer Riel because of its policy against transferring employees on PIPs or whose ratings were "below average." This contention turns the focus upon Riel's specific circumstances. In so doing, it mistakes the burdens of proof allocated to the parties; Riel need only show an accommodation reasonable "in the run of cases." The evidence of reasonableness "in the run of cases" and undue hardship will often be overlapping and resist neat compartmentalization. Nonetheless, they remain distinct inquiries even if asked of similar evidence.

EDS legally enjoys the affirmative defense of "undue hardship." But as EDS did not plead "undue hardship" and conceded below that it was not defending on those grounds at the summary judgment stage, our focus is limited to whether Riel has identified accommodations reasonable "in the run of cases." As we conclude that a trier of fact could conclude that neither adjustment of his

11

milestone deadlines nor transfer to a teaching position without such deadlines is unreasonable "in the run of cases," we must find that Riel has met his burden at this stage. EDS may not place the burden of proof of undue hardship on Riel merely by refusing to plead the affirmative defense and then attacking his proposed accommodations as unreasonable in his specific circumstance; Congress' intent was to place that burden on the employer. Rather, if EDS wishes to refute Riel's proposed accommodations as unreasonable in his specific circumstance, it must plead the defense and offer evidence to support it. Because EDS did not raise this issue at the summary judgment stage, we are unable to evaluate whether a question of fact exists on the issue, and we remand to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.